IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BILLY NETTLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:20-CV-174-WKW |
| ) | [WO] |
| HUNTER HURST, individually, *et al.*, ) | |
| ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION**

On March 8, 2019, Billy Nettles ("Mr. Nettles") was pulled over for suspected drunk driving and was taken to the Chilton County Jail ("the jail").[1] Once there, Mr. Nettles asserts that he was slammed onto the floor, after which Chilton County Deputy Sheriff Rodney Hurst ("Deputy Hurst"), City of Clanton Police Officer Hunter Hurst ("Officer Hurst"),[2] Chilton County Sergeant Allen Smitherman ("Sergeant Smitherman"), and Chilton County Police Officer Eason Abraham ("Officer Abraham") beat him, kicked him, stomped him, and, one of the Defendants, placed a "spit hood" over his head.[3] As a result, Mr. Nettles sues

---

[1] All citations use the pagination as designated in CM/ECF.

[2] Deputy Hurst and Officer Hurst are related. Deputy Hurst is the father of Officer Hurst. (Docs. # 54 at 2 n.1, 50-1 at 5, 50-3 at 7.)

[3] This sequence of events, unless restated, is referred to as "the incident," "the use of force incident," or "the alleged use of force incident."

Defendants under 42 U.S.C. § 1983 for violating his Fourth Amendment rights by using excessive force against him. (Doc. # 27.) A prior Order granted Deputy Hurst and Sergeant Smitherman's joint motion for summary judgment (Doc. # 51) as to Deputy Hurst but denied the motion as to Sergeant Smitherman. (Doc. # 73.) The prior Order also denied Officer Hurst's motion for summary judgment (Doc. # 53). (Doc. # 73.) The Order provided that an opinion would follow. This is the opinion.

## I. JURISDICTION AND VENUE

Because this action arises under 42 U.S.C. § 1983, the court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested.

## II. STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying

the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.  BACKGROUND

While it is unclear what happened during the incident at the jail, the material facts leading up to the incident are undisputed.  On March 8, 2019, Deputy Hurst responded to a report that a driver was swerving in and out of traffic on Interstate 65 ("I-65").  (Docs. # 50-1 at 5–6, 50-3 at 7.)  Deputy Hurst pulled Mr. Nettles over (Doc. # 50-1 at 6), and Officer Hurst assisted with the stop (Doc. # 50-3 at 7).  Deputy Hurst asked Mr. Nettles to step out of his truck, and he noticed that Mr. Nettles had "blurred vision, . . . slurred speech, [and] smell[ed] of alcohol."  (Doc. # 50-1 at 6.)  Mr. Nettles was placed in Officer Hurst's patrol vehicle to prevent the risk of an altercation on the side of the interstate.  (Doc. # 50-3 at 7–8.)  Officer Hurst transported Mr. Nettles to the jail (Doc. # 50-3 at 7), while Deputy Hurst remained on the side of I-65 to inventory the contents of Mr. Nettles's truck and to record any evidence prior to the tow truck's arrival.  (Doc. # 50-1 at 7.)

Six minutes and forty seconds after Officer Hurst left the scene, he arrived at the jail with Mr. Nettles.  (Doc. # 50-5 at 2.)[4]  Sergeant Smitherman saw Mr. Nettles for the first time when Mr. Nettles, wearing handcuffs, was escorted from Officer Hurst's patrol vehicle to the booking desk.  (Doc. # 50-2 at 7; Doc. # 50-7 at 16:00:00–16:00:25.)  Mr. Nettles was searched in front of the booking desk and then

---

[4] This figure comes from the Computer Aided Dispatch Report ("CAD Report").  While Mr. Nettles does not dispute that this is what the CAD Report says, he asserts that it is neither accurate nor admissible.  (Doc. # 67 at 7.)  For the reasons discussed below, the information in the CAD Report is permissible support for Defendants' motions for summary judgment.

4

uncuffed by Officer Abraham, who was wearing a body camera. (Docs. # 50-2 at 10, 50-7 at 16:00:26-16:01:33.)

Mr. Nettles then leaned on the desk, told a female corrections officer that he had been drinking, and declined to take a breathalyzer test. (Doc. # 50-7 at 16:01:40–16:01:51.) He exclaimed, "USA" and "Donald Trump," waived his hands, and said "I'm not gonna blow." (Doc. # 50-7 at 16:01:50–16:01:59.) In response, the female officer said, "It's okay. You don't have to." (Doc. # 50-7 at 16:02:00–16:02:04.) He then waived his right arm in the air toward the female officer (in a dismissive manner), muttered something, leaned forward on the desk, and began saying something. (Doc. # 50-7 at 16:02:00–16:02:04.)

An unidentified officer told Mr. Nettles to "step back on that bar for me." (Doc. # 50-7 at 16:02:04–16:02:05.) Mr. Nettles then said something that is incomprehensible, followed by "locked up everyone in here." (Doc. # 50-7 at 16:02:05–16:02:09.) A commotion occurred, and then Officer Abraham's body camera footage shut off. (Doc. # 50-7 at 16:02:21–16:02:22.)[5] After the body

---

[5] None of the Defendants describes or explains what transpired after the body camera shut off. They also do not explain what facts, if any, justified the use of force. (*See, e.g.,* Doc. # 50-3 at 14 (denying that Mr. Nettles "pos[ed] a threat to any officer," apart from his "irritat[ion] on the interstate").) The closest they come is Deputy Hurst saying that someone is only put in the restraint chair "for causing disturbance of whatever type." (Doc. # 50-1 at 9.) Inferring from that statement, one could say that Mr. Nettles was causing a disturbance, which is not clear from the video footage. In addition, Defendants assert that Officer Abraham's body camera footage shut off due to an issue that was unknown at the time: The wire connecting the parts of the body camera became disconnected during the alleged use of force incident, which ended the recording. (Doc. # 50-2 at 10.)

camera footage shut off, Mr. Nettles says that Defendants subjected him to excessive force.[6]

In addition to the foregoing series of events leading up to the use of force, Defendants point to other additional details that they contend support their defenses of qualified immunity. First, Officer Hurst emphasizes that, after Mr. Nettles was taken out of his vehicle (Doc. # 52-2 at 7), Officer Hurst left the facility on another assignment. (Doc. # 52-5 at 3.) Officer Hurst testified that he had no contact with Mr. Nettles until approximately an hour later when he was summoned back to the jail to assist with "read[ing] Mr. Nettles his 'implied consent' to having his drivers' license suspended" and observed Mr. Nettles wearing a "spit hood." (Doc. # 52-5 at 2.) Officer Hurst states that he did not use any force against Mr. Nettles at the jail and does not remember any use of force incident. (Doc. # 52-2 at 7, 12–13.)

Second, Sergeant Smitherman contends that he did not witness any of the alleged use of force incident against Mr. Nettles. (Doc. # 54 at 17.) He says that, prior to the incident, he told Mr. Nettles to "put [his] hands down" as he walked to the property room to "get [Mr. Nettles's] uniform and box and stuff set up for [Mr. Nettles's] property." (Docs. # 50-2 at 7, 50-7 at 16:02:09-16:02:11.) Sergeant Smitherman further testified that he was in the property room with his back toward Mr. Nettles when he heard the commotion of the incident. (Doc. # 50-2 at 7.)

---

[6] Mr. Nettles was released from the jail the next day. (Docs. # 53 at 5, 66 at 8.)

According to Sergeant Smitherman, when he turned around "Mr. Nettles was laying on the [floor]," and Officers Brian Ashworth ("Officer Ashworth") and Abraham were attempting to secure Mr. Nettles in handcuffs. (Doc. # 50-2 at 7.) At that point, Sergeant Smitherman knelt on one knee and placed his hand on Mr. Nettles's back to prevent him from getting up until he was secured in handcuffs. (Doc. # 50-2 at 8.)

Officers Ashworth and Abraham picked Mr. Nettles up from the floor. (Doc. # 50-2 at 8.) Sergeant Smitherman "helped them secure him in the restraint chair." (Doc. # 50-2 at 9.) Sergeant Smitherman denied (or could not recall) any other use of force against Mr. Nettles. (Doc. # 50-2 at 8–9.) After Mr. Nettles had been moved from a restraint chair to a steel chair in the booking area a few hours after the incident, Sergeant Smitherman noticed that it looked like there was something wrong with Mr. Nettles's shoulder. (Doc. # 50-2 at 8.) He asked Mr. Nettles about it, and Mr. Nettles told him that he "got banged up playing football," which Sergeant Smitherman took to mean that he had "a preexisting condition." (Doc. # 50-2 at 10.) The jail nurse saw Mr. Nettles the morning after the incident, and an x-ray was ordered. (Docs. # 50-2 at 10, 50-12 at 3–4.) But he was released before the mobile x-ray company arrived at the jail. (Docs. # 50-2 at 10.)

Mr. Nettles provides a different account of what happened. He testified that, when he was at the booking desk, he was having a "pleasant conversation with a

7

female employee." (Doc. # 50-4 at 43.)[7] Shortly after, Mr. Nettles heard an unidentified officer tell him to "stop resisting," and Mr. Nettles was confused since he was not "resisting anything." (Doc. # 50-4 at 12, 23, 43.) Mr. Nettles says he was then slammed onto the floor, was beaten by Sergeant Smitherman, Officer Abraham, Deputy Hurst, and Officer Hurst, was kicked by Defendants, was stomped by Defendants, and had a "spit hood" placed over his head by one of the Defendants. (Doc. # 50-4 at 12, 23–24, 37, 43; Doc. # 52-1 at 10; Doc. # 52-5 at 3.) While on the floor during this incident, Mr. Nettles was unable to shield himself from the blows. (Doc. # 50-4 at 42.)

While the handcuffs had been removed when he arrived at booking, he was re-handcuffed during the use of force incident. (*See* Doc. # 50-4 at 42.) He could not remember who re-cuffed him (Doc. # 50-4 at 42), but recounts that "Defendant Hurst" and one of the other Defendants lifted him off the floor by his handcuffs. (Doc. # 50-4 at 43.)[8] According to Mr. Nettles, this act dislocated his left shoulder and caused his right shoulder to be overextended. (Doc. # 50-4 at 44.) And, according to Mr. Nettles, he received other injuries from the beating. These included

---

[7] Defendants object to this testimony because, during his deposition, Mr. Nettles's lawyer read the allegations in the First Amended Complaint and asked him if he confirmed the truth of those allegations. (Doc. # 71 at 4.) Defendants do not cite any authority that prohibits this form of questioning. Mr. Nettles also independently confirmed his testimony without the allegedly improper prompting. (Doc. # 50-4 at 12, 23–24, 37, 43.) For purposes of assessing the facts on the summary judgment record, Defendants' objection lacks merit.

[8] It is unclear from the deposition if this "Defendant Hurst" is Deputy Hurst or Officer Hurst. (Doc. # 50-4 at 44–45.) And Nettles also says at another spot in his deposition that he was not sure who the two officers were who picked him up. (Doc. # 52-1 at 10–11.)

a bruise to his right knee, a "sprained neck," a bruised right rib, swelling to his head (particularly "five lumps"), injury to his right hip, and lower back pain. (Doc. # 50-4 at 44.) He says that he did not have any of these injuries before the incident at the jail. (Doc. # 50-4 at 44.)[9]

## IV. DISCUSSION

Mr. Nettles sues each Defendant in his individual capacity under 42 U.S.C. § 1983 for violating his Fourth Amendment rights by using excessive force against him. (Doc. # 27 at 3–5.) Claims of excessive force under the Fourth Amendment are measured "under an objective-reasonableness standard." *Patel v. City of Madison*, 959 F.3d 1330, 1338 (11th Cir. 2020). This standard asks whether "the officer's . . . conduct [was] objectively reasonable in light of the facts confronting the officer." *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)).

To determine whether an officer's use of force was reasonable, district courts should consider the following factors:

> (1) the severity of the crime; (2) whether the individual "pose[d] an immediate threat to the safety of the officers or others[;]" . . . (3) whether the individual "actively resist[ed] arrest or attempt[ed] to evade arrest by flight[;]" . . . (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury.

---

[9] Mr. Nettles makes several other claims regarding the aftermath of the incident at the jail. These include that after making bond the following day, an elderly man named Mr. Johnson at the jail noticed that he (Mr. Nettles) was injured and took him to the nearest motel to convalesce. (Doc. # 50-4 at 12.) Once there, another man who was a paramedic examined Mr. Nettles and saw that his shoulder was dislocated. (Doc. # 50-4 at 12.) That individual called an ambulance, and Mr. Nettles was taken to a hospital in Birmingham. (Doc. # 50-4 at 12.) While these subsequent occurrences do not pertain to the incident itself, they are included for context.

9

*Id.* (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989), and citing *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002)).

Deputy Hurst, Officer Hurst, and Sergeant Smitherman argue that the defense of qualified immunity shields them from liability. (Docs. # 51, 53 at 7–9, 54 at 12–18.) "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard*, 311 F.3d at 1346 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To assert the defense of qualified immunity, government officials have the "burden of establishing that [they] [were] acting 'within the scope of [their] discretionary authority.'" *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995)). Here there is no dispute that Deputy Hurst, Sergeant Smitherman, and Officer Hurst were acting pursuant to their discretionary authority as law enforcement officers.

Once discretionary authority is established, a plaintiff must satisfy two elements to avoid the imposition of qualified immunity: (1) "that the facts, when construed in the plaintiff's favor, show that the official committed a constitutional violation and, if so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015) (citing *McCullough v. Antolini*, 559 F.3d 1201, 1205

(11th Cir. 2009)). Defendants' motions for summary judgment are addressed in turn.

A. **Deputy Hurst & Sergeant Smitherman's Motion for Summary Judgment**

   1. *Deputy Hurst*

Before asserting a qualified immunity defense (Doc. # 54 at 12–18), Deputy Hurst argues something more fundamental: He was not physically present at the jail when the incident occurred and is therefore entitled to summary judgment on Mr. Nettles's excessive force claim against him. (Doc. # 54 at 12.) The basis for this argument is video footage and the CAD Report. (*See* Doc. # 54 at 6–8.)

Although on summary judgment the court views the evidence in the light most favorable to the non-moving party, *Gutierrez*, 627 F.3d at 820, when video evidence "obviously contradicts" the non-moving party's "version of the facts," the court accepts that "depiction instead of [the non-movant's] account." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007))); *see also Charles v. Johnson*, 18 F.4th 686, 692 n.1 (11th Cir. 2021) ("Where video evidence is conclusive, witness testimony cannot be used to introduce a factual dispute." (citing *Scott*, 550 U.S. at 380)). On the other hand, in

11

a case where there is "no obviously contradictory video evidence," the court credits the non-movant's "version of the record evidence." *Gee*, 625 F.3d at 1315.

Here, the video footage establishes an obvious contradiction between Deputy Hurst's version of the facts and Mr. Nettles's. Mr. Nettles claims that Deputy Hurst followed Officer Hurst back to the jail (Doc. # 50-4 at 11) and was one of the group of Defendants who beat him up at the jail. (Doc. # 50-4 at 23, 34, 41, 43.) But the evidence demonstrates otherwise.

Deputy Hurst's glasses' camera video shows that Mr. Nettles was placed in a black and white marked police vehicle. (*See* Doc. # 50-6 at 16:48:25–16:48:39.) Thereafter, that vehicle, driven by Officer Hurst,[10] pulled out and left the scene, while the other vehicle and Deputy Hurst remained behind to inventory the contents of Mr. Nettles's truck. (Doc. # 50-6 at 16:54:40–16:54:48.)[11] According to the dash camera in Deputy Hurst's vehicle, Officer Hurst left the scene with Mr. Nettles at approximately 3:50 p.m. (Doc. # 50-9 at 03:50:38 PM.) Deputy Hurst's glasses' camera then records for approximately another sixteen minutes while Deputy Hurst remains on the shoulder of I-65. (Doc. # 50-6 at 16:54:48–17:11:00.)

---

[10] Mr. Nettles does not dispute that Officer Hurst transported him to the jail. (Docs. # 50-3 at 7, 52-5 at 2, 53 at 2, 66 at 5.)

[11] Mr. Nettles acknowledges that Deputy Hurst did not transport Mr. Nettles to the jail but remained behind to inventory the contents of Mr. Nettles's truck. (Docs. # 50-1 at 7, 54 at 5, 67 at 7.) This evidence is in tension with what he said at his deposition (that Deputy Hurst followed Officer Hurst to the jail). (Doc. # 50-4 at 11.)

Meanwhile, Officer Abraham's body camera footage shows the black and white marked police vehicle pulling into the jail approximately nine minutes after it left the scene. (Doc. # 50-7 at 15:59:34.) That same body camera footage shows that less than three minutes later the camera shut off, after which Mr. Nettles says the use of force incident occurred. (Doc. # 50-7 at 16:02:23.) This means that Deputy Hurst was still on the shoulder of I-65 when the use of force incident occurred at the jail.

The CAD Report verifies the time stamps in the video footage and independently supports Deputy Hurst's argument. Mr. Nettles objects to Defendants' reliance on the CAD Report, disputing its accuracy and admissibility. (*See, e.g.*, Doc. # 67 at 7.) But he provides no explanation for why he contends the CAD Report is inaccurate or inadmissible. Defendants assert that the CAD Report is a report of "the times of events related to [Mr.] Nettles' DUI arrest as logged in real-time by the dispatcher." (Doc. # 54 at 2.) Such a report likely would be admissible at trial under Rule 803(6) of the Federal Rules of Evidence, and Mr. Nettles offers no reason to question its accuracy.

The CAD Report supports Deputy Hurst's argument that he was not at the jail when the use of force incident occurred. First, the Report shows that Officer Hurst left the scene on I-65 with Mr. Nettles at approximately 3:50 p.m. on March 8, 2019. (Doc. # 50-5 at 2.) It then shows that Officer Hurst arrived at the jail at

13

approximately 3:57 p.m. (Docs. # 50-5 at 2, 52-5 at 2 (noting that "[w]e arrived approximately at 4:00 PM").)[12] And it shows that Deputy Hurst did not leave the scene on I-65 until 4:06 p.m. (Doc. # 50-5 at 2.)

The timeline established by the video footage, and corroborated by the CAD Report, demonstrates that Deputy Hurst was not at the jail when the incident occurred. Deputy Hurst could not be on the shoulder of I-65 completing an inventory of the contents of Mr. Nettles's truck and physically assaulting Mr. Nettles at the same time in the jail. There is no genuine dispute of material fact as to Deputy Hurst's whereabouts at the time of the use of force incident or as to his physical absence during the use of force incident.

Mr. Nettles has not presented evidence that links Deputy Hurst to the alleged use of force incident and therefore has not shown that Deputy Hurst violated his Fourth Amendment rights. Because the undisputed evidence establishes that no constitutional violation occurred, it is unnecessary to reach the issue of whether Deputy Hurst would be entitled to qualified immunity had a violation occurred. For these reasons, Deputy Hurst and Sergeant Smitherman's motion for summary judgment was granted as to Deputy Hurst. (Doc. # 73.)

---

[12] There is an approximately two-minute discrepancy between this report and what Officer Abraham's body camera footage shows, but this discrepancy does not undermine the evidence that Deputy Hurst was not present at the jail when the use of force incident occurred.

### 2.     *Sergeant Smitherman*

Mr. Nettles asserts that Sergeant Smitherman was one of the officers who beat him, kicked him, and stomped him. (*See* Doc. # 50-4 at 12, 23, 37, 43; Doc. # 54 at 10; Doc. # 67 at 12.) Sergeant Smitherman argues that he is entitled to qualified immunity. (Doc. # 54 at 14–18.) He points to his interactions with Mr. Nettles (Doc. # 54 at 16–17): His back was toward Mr. Nettles when the use of force incident occurred (Doc. # 50-2 at 7); when he turned around, "Mr. Nettles was laying on the [floor]," and Officers Ashworth and Abraham were securing him in handcuffs (Doc. # 50-2 at 7); Sergeant Smitherman knelt on one knee and placed his hand on Mr. Nettles's back to prevent him from getting up until he had been secured in handcuffs (Doc. # 50-2 at 8); Officers Ashworth and Abraham picked Mr. Nettles up from the floor (Doc. # 50-2 at 8); and Sergeant Smitherman did not observe any other use of force against Mr. Nettles (Doc. # 50-2 at 8–9). Sergeant Smitherman asserts that "[t]hese actions . . . fall far short of violating [Mr.] Nettles' right to be free of use of force." (Doc. # 54 at 17.)

If this version of the story is accepted as true, then Sergeant Smitherman presumably is correct that his conduct does not rise to the level of force required in this circuit to overcome qualified immunity. *See Stephens v. DeGiovanni*, 852 F.3d 1298, 1321–24 (11th Cir. 2017) (landing multiple blows on a compliant, handcuffed arrestee); *Hadley v. Gutierrez*, 526 F.3d 1324, 1329–30 (11th Cir. 2008) (punching

15

a handcuffed, compliant arrestee in the stomach); *Lee*, 284 F.3d at 1198–1201 (slamming a compliant, handcuffed arrestee's head into her car trunk); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (kicking a handcuffed, compliant arrestee in the ribs and repeatedly hitting his head on the pavement, rendering him unconscious).

But Sergeant Smitherman's account is only one side of the story. Sergeant Smitherman says he was not involved in the alleged use of force incident. But Mr. Nettles says the opposite. According to Mr. Nettles, he was not "resisting anything," but he was beaten by Defendants, was kicked by Defendants, and was stomped by Defendants. (Doc. # 50-4 at 12, 23, 37, 43; Doc. # 54 at 10; Doc. # 67 at 12.) If a jury credits Mr. Nettles's story, such conduct falls within what the Eleventh Circuit has clearly established as excessive force as applied to non-resistant arrestees. *See Stephens*, 852 F.3d at 1321–24; *Hadley*, 526 F.3d at 1329–30; *Lee*, 284 F.3d at 1198–1201; *Slicker*, 215 F.3d at 1233. There is no video footage that establishes Sergeant Smitherman's version of the story; Officer Abraham's body camera footage shut off the moment the incident began. So there is no video evidence that "obviously contradicts" Mr. Nettles's "version of the facts." *Gee*, 625 F.3d at 1315.

The footage depicts Sergeant Smitherman walking toward (and likely past) Mr. Nettles before it stops. (Docs. # 50-7 at 16:02:07–16:02:11, 50-2 at 7 (explaining that he was walking between Officer Abraham and Mr. Nettles "to go

into the property room to get [Mr. Nettles's] uniform and box and stuff set up for his property").)[13]  Approximately ten seconds later, the alleged use of force incident occurred.  (Doc. # 50-7 at 16:02:21.)  The evidence (or lack thereof) raises more questions than it answers.  Did Sergeant Smitherman go to the property room?  Was his back turned toward Mr. Nettles?  Or did he join the other officers in the use of force incident?  "[W]here the recording does not clearly depict an event or action, and there is evidence going both ways on it, [the court] take[s] the [non-movant's] version of what happened."  *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018); *see also Gee*, 625 F.3d at 1315.

On the summary judgment record, Mr. Nettles's narrative must be accepted "as controlling."  *Buckman v. Morris*, 736 F. App'x 852, 853 (11th Cir. 2018); *see also Gee*, 625 F.3d at 1317 (affirming the denial of qualified immunity by accepting the plaintiff's version of the facts as true and noting that the force used, per the plaintiff's narrative, would be constitutionally impermissible).  As a result, there is a genuine dispute of material fact as to whether Sergeant Smitherman used excessive force against Mr. Nettles.  As it stands, this is "a classic swearing match, which is the stuff of which jury trials are made."  *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th

---

[13] In addition, while it is hard to tell what happened because Mr. Nettles is not in the body camera footage, when Sergeant Smitherman walks by, it looks like he throws a punch toward Mr. Nettles, which is followed by a noise that sounds like something (or someone) was hit.  (Doc. # 50-7 at 16:02:07-16:02:11.)

Cir. 2013)). Therefore, Deputy Hurst and Sergeant Smitherman's motion for summary judgment on the basis of qualified immunity was denied as to Mr. Nettle's Fourth Amendment excessive force claim against Sergeant Smitherman. (Doc. # 73.)

### B.  Officer Hurst's Motion for Summary Judgment

Mr. Nettles asserts that Officer Hurst was one of the officers who beat him, kicked him, and stomped him during the incident. (Doc. # 50-4 at 12, 23, 37, 43; Doc. # 53 at 3; Doc. # 66 at 6.) Officer Hurst asserts, first, that he did not exert any force on Mr. Nettles after placing him in his law enforcement vehicle for transport to the jail. (Doc. # 53 at 6; Doc. # 50-3 at 13–14; Doc. # 52-2 at 12; Doc. # 52-5 at 2.) Second, he invokes qualified immunity. (Doc. # 53 at 6–8.)

But again, like with Sergeant Smitherman, there remains a genuine dispute of material fact as to whether Officer Hurst used excessive force against Mr. Nettles. He says he was not involved. Mr. Nettles says he was. If Mr. Nettles's story is accepted as true, Officer Hurst's beating him, kicking him, and stomping him (as a compliant arrestee) is an excessive use of force under the clearly established law of this circuit. *See Stephens*, 852 F.3d at 1321–24; *Hadley*, 526 F.3d at 1329–30; *Lee*, 284 F.3d at 1198–1201; *Slicker*, 215 F.3d at 1233. There is no video footage to establish that Officer Hurst was not involved since Officer Abraham's body camera footage shut off the moment the incident began. Per Officer Abraham's body camera

footage, Officer Hurst was in the room, albeit not directly next to Mr. Nettles, when the incident occurred. (Doc. # 50-7 at 16:01:57–16:02:21.)

Again, the evidence (or lack thereof) raises more questions than it answers. Did Officer Hurst participate in the use of force incident, as Mr. Nettles recalls? Or was he physically absent during the incident only to return to the jail one hour later, after the incident, when Mr. Nettles was in the restraint chair? (Doc. # 52-5 at 3.) The record is not clear. Those questions (and others like them) are best left for the jury to resolve. *See Sears*, 922 F.3d at 1208. Because Mr. Nettles's narrative must be accepted "as controlling," *Buckman*, 736 F. App'x at 853, Officer Hurst's motion for summary judgment on the basis of qualified immunity was denied. (Doc. # 73.)

## V.  CONCLUSION

Three of the four Defendants moved for summary judgment on Mr. Nettles's claims alleging excessive force in violation of the Fourth Amendment. Because there exist genuine disputes of material fact as to whether Sergeant Smitherman and Officer Hurst violated the clearly established law of this circuit in their alleged use of force against Mr. Nettles, qualified immunity is not an appropriate basis for summary judgment. On the undisputed material facts, however, Deputy Hurst is entitled to qualified immunity and thus to the entry of summary judgment in his favor. For these reasons, a prior Order granted Deputy Hurst and Sergeant Smitherman's joint motion for summary judgment (Doc. # 51) as to Deputy Hurst

but denied the motion as to Sergeant Smitherman. (Doc. # 73.) The prior Order also denied Officer Hurst's motion for summary judgment (Doc. # 53). (Doc. # 73.) Therefore, Mr. Nettles's claims against Officer Hurst and Sergeant Smitherman proceed to trial. The Clerk of the Court is DIRECTED to terminate Rodney Hurst as a party.

DONE this 12th day of October, 2022.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE